

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-23-2000

# Shoats v. Horn

Precedential or Non-Precedential:

Docket 99-3603

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Shoats v. Horn" (2000). *2000 Decisions.* Paper 108.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/108

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 23, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3603

RUSSELL SHOATS,

      Appellant

v.

MARTIN HORN, in his official capacity as the
Commissioner of the Pennsylvania
Department of Corrections;
PHILIP JOHNSON, in his official capacity as
Superintendent of the State Correctional
Institution at Greene

APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 97-cv-01811)
District Judge: The Honorable Gary L. Lancaster

ARGUED FEBRUARY 3, 2000

BEFORE: MANSMANN, NYGAARD and RENDELL,
Circuit Judges.

(Filed: May 23, 2000)

Daniel M. Kovalik, Esq. (Argued)
Room 807
5 Gateway Center
Pittsburgh, PA 15222

 Attorney for Appellant

John G. Knorr, III, Esq. (Argued)
J. Bart DeLone, Esq.
Office of Attorney General
 of Pennsylvania
Department of Justice
Strawberry Square, 15th Floor
Harrisburg, PA 17120

 Attorneys for Appellees

OPINION OF THE COURT

NYGAARD, Circuit Judge.

Appellant Russell Shoats is currently imprisoned in the State Correctional Institution at Greene, Pennsylvania ("SCI-Greene"), and brings this civil rights action pursuant to 42 U.S.C. S 1983. He challenges his continued confinement in administrative custody, i.e., solitary confinement. Shoats claims that Appellees, the Pennsylvania Department of Corrections and Philip Johnson, Superintendent of SCI-Greene, have kept him in administrative custody in violation of his Fourteenth Amendment right to procedural due process. He seeks immediate release into the general prison population, damages, and other relief.

Although we hold that Shoats has a protected liberty interest in being released from administrative confinement, we conclude that SCI-Greene's procedures for evaluating whether Shoats should remain in administrative custody comported with procedural due process requirements. Accordingly, we will affirm.

I. Factual Background

In 1970, Shoats was convicted of first degree murder for his part in an attack on a Philadelphia police guardhouse.

Shoats participated in the attack as a member of a black revolutionary group that sought to eradicate all authority. One police officer was killed and another seriously wounded in the attack. Shoats was sentenced to life imprisonment. Seven years later, in September 1977, Shoats and several other inmates took over a cell block at the Huntingdon State Correctional Institution as part of an attempt to escape. Shoats injured several guards with a knife, and, along with three other prisoners, attempted to escape from the prison as planned. Two of the inmates were captured immediately and a third was killed during the escape. Shoats remained at large until he was captured in October 1977.

While Shoats was a fugitive, he entered the home of a prison guard and forced him, his wife, and theirfive year old son to drive him in their car to a location outside Cokesburg, Pennsylvania. Shoats then ordered the hostages to enter the woods where he left them tied to a tree for almost four hours. Shoats was captured, and convicted of escape, robbery, kidnaping and simple assault. He was later transferred to Fairview State Hospital for the criminally insane. In March 1979, Shoats had guns smuggled in to him and escaped from that maximum security institution, again taking a hostage. In addition to escape and taking hostages, Shoats also has a history of threatening and assaulting his fellow inmates, and of causing disruptions at the institutions in which he is incarcerated.

Pennsylvania correctional institutions have two basic types of housing, general population and restricted housing. An inmate in general population may be permitted to be outside of his cell for lengthy periods throughout the day. General population inmates are permitted to have contact visits at least one day per week, and may participate in educational and vocation programs, approved inmate organizations, and approved fund-raising projects.

Inmates in disciplinary and administrative custody are confined in Restricted Housing Units (RHU). They are housed in disciplinary custody when, following a hearing, they have been found guilty of prison misconduct. The maximum period that an inmate may be confined in

3

disciplinary custody is ninety days. In contrast, administrative custody is used to assure a safe and secure environment for all inmates and staff by separating those inmates whose presence in the general population constitutes a threat to themselves, others, or the safety and security of the institution, or who represent an escape risk. Inmates in administrative custody are not allowed to have radios, televisions, telephone calls (except emergency or legal), personal property except writing materials, or books other than legal materials and a personal religious volume. Non-legal visits of one per week are allowed under appropriate security procedures designated by the Program Review Committee (PRC). Pennsylvania does not provide inmates in administrative custody with educational programs, and all meals are eaten in the inmates' cells.

Unlike disciplinary custody, there is no maximum period of confinement in administrative custody. Rather, release depends upon an evaluation of many factors. While time spent and behavior are to be considered, so too are continued risk, safety of others, and recommendations of prison personnel, including treatment staff.

Under Department of Corrections (DOC) policy, an inmate must receive written notice of the reason for his placement in administrative custody and he is entitled to receive a hearing before a PRC within six days of the initial transfer to administrative custody. Every thirty days thereafter, inmates assigned to administrative custody have the opportunity to be personally interviewed by the PRC, which then determines whether the inmate should continue to be maintained in administrative custody, taking into account a variety of factors including the safety of other inmates and staff, the continued public or institutional risk, and the recommendation of treatment staff.

In addition to separation from the general prison population, the DOC may order that specific prisoners be separated from each other and, if necessary, placed in different institutions. The DOC may enter such orders after reviewing specific instances of misconduct, and determining that specific separation is appropriate. As a result of such review, Shoats currently has fifteen individuals from whom he must be separated.

4

As of 1989, Shoats was imprisoned at the State Correctional Institution in Dallas, Pennsylvania ("SCI-Dallas"), where he was placed in administrative custody. In November of that year he was transferred to the federal penitentiary at Leavenworth, Kansas. When he returned to Pennsylvania in June 1991, Shoats was again imprisoned at SCI-Dallas and again placed in administrative custody. In January 1995, he was transferred to SCI-Greene, where he continues to be held in administrative custody.

Shoats has spent an extraordinarily long period in administrative custody. Nonetheless, his status has been subject to PRC review every thirty days. No member of a PRC has ever recommended releasing Shoats from administrative custody; they have universally concluded that Shoats remains a significant danger to institutional safety and security. These conclusions are supported by DOC psychological evaluations of Shoats, which characterize him as a remorseless sociopath knowledgeable in the workings of prisons and escape techniques, capable of leading other inmates in such undertakings, and inclined to do so. He has also been described as volatile and manipulative.

In June 1998, the Secretary of the DOC asked Thomas James, a special assistant to the Secretary, to conduct an extensive review to determine whether Shoats should remain in administrative custody. James recognized that such extended administrative custody was atypical for the prison population. He noted that Shoats' volatile nature and need to be separated from numerous other prisoners make his situation unique. However, his review also concluded that, as with other inmates who have a history of escape and violence against correctional officers and other inmates, Shoats' continued placement in administrative custody is absolutely necessary.

Thereafter, Shoats brought this action pursuant to 42 U.S.C. S 1983, seeking to be immediately released into the general prison population. He also sought damages and other relief. He claims that the appellees, the Secretary of the DOC and the Superintendent of SCI-Greene, have kept him in administrative custody in violation of his Fourteenth Amendment right to procedural due process.

Following discovery, the parties filed cross-motions for summary judgment. The District Court agreed with Shoats that he possesses a protected liberty interest in obtaining release into the general population. However, adopting the recommendation of the magistrate judge, the District Court held that the defendants had provided Shoats with the process he was due and granted the defendants' motion for summary judgment. This appeal followed.

II. Discussion

Shoats claims that the duration of his placement in solitary confinement, and the attendant hardships of such confinement, require that we affirm the District Court's conclusion that he possesses a protected liberty interest in being released to the general prison population. He also claims that Defendants did not afford him all of the process he was due. The record evidence leads us to conclude that although Shoats' confinement is sufficient to trigger the procedural protections of the Due Process Clause, the process provided him was sufficient to pass Constitutional muster.

A. Shoats' Liberty Interest

In analyzing a procedural due process claim, thefirst step is to determine whether the nature of the interest is one within the contemplation of the `liberty or property' language of the Fourteenth Amendment. See Fuentes v. Shevin, 407 U.S. 67 (1972). Once we determine that the interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it. See Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

Protected liberty or property interests generally arise either from the Due Process Clause or from state-created statutory entitlement. See Board of Regents v. Roth, 408 U.S. 564, 575 (1972). In Sandin v. Conner, 515 U.S. 472 (1995), the Supreme Court announced a new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protected by procedural due process guarantees. Although the Court acknowledged that liberty interests could arise from means other than the Due Process Clause itself, the Court concluded that state-

6

created liberty interests could arise only when a prison's action imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483.

At issue in Sandin was whether the plaintiff's thirty-day detention in disciplinary custody in a Hawaii prison impacted any protected liberty interest under the Fourteenth Amendment. The Court concluded that the prisoner in Sandin did not have a protected liberty interest in remaining free of disciplinary detention or segregation because his thirty-day detention, although punitive,"did not exceed similar, but totally discretionary confinement in either duration or degree of restriction." Id. at 486. In finding that the prisoner's thirty-day confinement in disciplinary custody did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest, the Court considered the following two factors: 1) the amount of time the prisoner was placed into disciplinary segregation; and 2) whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement. Id.

The parties in this case do not dispute the fact that very few Pennsylvania prisoners have been confined in administrative custody for periods of eight years or more. Ben Varner, the Superintendent who reviewed the PRC decisions on Shoats, testified that to the best of his recollection, approximately one percent of the inmate population at SCI-Greene has been confined in restricted housing for such lengthy periods of time. (Varner Dep. at 54-61; A145-52). Moreover, Thomas James, Special Assistant to DOC Commissioner Martin Horn, concedes that the amount of time Shoats has already spent in administrative confinement is not only atypical, but is indeed "unique." A214-15.

In addition, the record suggests that Shoats' long-term confinement has imposed a significant hardship on him in relation to the ordinary incidents of prison life. Shoats has been confined in virtual isolation for almost eight years. See A45 (Shoats Dep.). He is confined in his cell for 23 hours a day, five days a week, and 24 hours a day, two days a

7

week. Id. He eats meals by himself. Id. His sole contact is with DOC officials, and has been denied contact with his family for almost eight years. Id. He is prohibited from participating in any educational, vocational, or other organizational activities. Id. He is prohibited from visiting the library. Id. James concedes that he has never witnessed one example of such permanent solitary confinement in his 22 years with the DOC. See A211. Moreover, James explained that he would be concerned about the psychological damage to an inmate after only 90 days of such confinement and would generally recommend transfer to the general population after 90 days as a consequence. See A184-85, 188-90.

Based on this record, we have no difficulty concluding that eight years in administrative custody, with no prospect of immediate release in the near future, is "atypical" in relation to the ordinary incidents of prison life, and that Shoats' eight-year confinement subjects him to conditions that differ significantly from "routine" prison conditions in Pennsylvania state institutions.

B. Shoats' Due Process Claim

Although we hold that Shoats has a protected liberty interest that has been adversely affected by his indefinite segregation in administrative custody, we reject Shoats' argument that he has been deprived of the process he is due under the Fourteenth Amendment.

In Hewitt v. Helms, 459 U.S. 460 (1983), the Supreme Court considered whether prison inmates were entitled to due process before being placed in solitary confinement for administrative -- rather than disciplinary -- reasons. The Court expressly rejected the idea that due process required a "detailed adversary proceeding," on the ground that it would not "materially assist" the decision to be made. Id. at 473-74. The Court further held that in these situations, an "informal, nonadversary review" at which the prisoner has the opportunity to state his views, satisfies the requirements of due process:

> An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding

8

whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

Id. at 476.

The inmate in Hewitt received notice of the charges against him the day after his misconduct took place. Id. at 477. Only five days after his transfer to administrative segregation, a Hearing Committee reviewed the existing evidence against him. Id. Moreover, the inmate acknowledged on his misconduct form that he "had the opportunity to have [his] version reported as part of the record," and thus had an opportunity to present a statement to the Committee. Id. The Supreme Court held that this proceeding plainly satisfied the Due Process requirements for confinement of the inmate in administrative custody. Id. Here, Shoats has been given exactly the same opportunities as those given to the inmate in Hewitt; there is therefore no question that, on its face, the procedure provided to Shoats is constitutionally adequate.

The process provided by the Pennsylvania DOC to an inmate confined in administrative custody is as follows. A hearing is conducted by the PRC, in which the rationale for the administrative custody placement is read and explained to the inmate. See A84. The inmate is permitted to respond to the rationale for administrative custody placement either orally or in writing. Id. A Committee member then drafts a summary of the inmate's statements. Id. A written summary of the entire hearing is then prepared, which includes the reasons relied upon by the PRC to reach its decision, and a copy of this summary is given to the inmate. Id.

An inmate may appeal the PRC's decision to the Superintendent in writing within two days of the completion

9

of the hearing, and the decision of the Superintendent must be forwarded to the inmate within ten days of the receipt of the appeal. See A85. The inmate's right to appeal terminates when he or she is released from administrative custody. Id.

At least once every thirty days, those inmates assigned to administrative custody have the right to be personally interviewed by the PRC. Id. For those inmates not released from administrative custody following the thirty-day review, the reasons for the PRC's decision are forwarded to the Superintendent for his or her review. Id. If the Superintendent agrees that the rationale for holding an inmate in administrative custody is reasonable, he or she notifies the inmate accordingly. Id. If, however, the Superintendent believes the inmate should be released to the general population, he or she will so order it. Id.

After an inmate is confined for ninety days in administrative custody, the Superintendent must complete a formal report to the Regional Deputy Commissioner, who then reviews the recommendation of the institution to determine if any further action is necessary. Id. Further action may include release to the general population, transfer to another facility or program, or continuation in administrative custody. Id. In light of the standard set forth by the Supreme Court in Hewitt, we conclude that the Pennsylvania procedures clearly comply with due process requirements.

The record reflects that the procedures called for did in fact occur. Specific program review committee progress reports are included in the record, which reflect Shoats' choice to appear at some, but not all, of his PRC reviews. The reports reflect that Shoats raised and discussed various issues at these committee sessions, including his desire for library time, complaints about the commissary and medical treatment, visitation rights, and other general matters. In many instances, Shoats complained about the denial of his release into the general population, and he was advised of the prison's reasons for denying his release. There is no indication that Shoats presented any countervailing arguments or considerations to the review committee.

10

Shoats does not argue that he was denied the opportunity to respond or be heard, nor does he argue that the prison authorities failed to consider favorable information or that they otherwise dealt with his case in a perfunctory fashion. Cf. Sourbeer v. Robinson , 791 F.2d 1094, 1101 (3d Cir. 1986). In fact, Shoats does not contend that he made any arguments, or offered any favorable factual data to counter the prison's rationale for holding him. Rather, Shoats argues that his continued confinement in administrative custody is based solely on his past crimes of murder, escape, kidnaping and assault, and therefore has no contemporaneous justification. (Appellant's Br. at 42-48). We disagree. Shoats is not confined to administrative custody simply because he committed crimes in the past, but because he is, in the considered judgment of all the prison professionals who have evaluated him, a current threat to the security and good order of the institution, and to the safety of other people. See A238-44 (Mistrick Dep.). This assessment is based partly on Shoats' conduct, but also on the prison professionals' current impressions of him based on their day-to-day dealings with Shoats over time. See, e.g., A243 (Mistrick Dep.)("[H]e represents a danger to the secure running of the institution and the safety of others"); A115 (Varner Dep.)("[I]n my opinion, this man was still a danger"); A169 (White Dep.)("I felt he was still dangerous").

Even were we to conclude that Shoats' continued confinement in administrative custody is based solely on his past crimes, the process he received would nonetheless pass constitutional muster, because predictions of likely future behavior based on a generally volatile criminal character have been upheld by the Supreme Court:

> In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other

11

prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior.

See Hewitt, 459 U.S. at 474 (internal citations omitted). Thus, Shoats could conceivably be held in administrative custody merely because his prior crimes reasonably foreshadow future misconduct.

Shoats also claims that his confinement is the result of the "bias" of Superintendent Varner, who reviewed his confinement at SCI-Greene, first as a member of the PRC and later as Superintendent. (Appellant's Br. at 38-39). However, Shoats' administrative custody dates back to 1991, long before Shoats came to SCI-Greene, and it has continued to the present, long after Varner left SCI-Greene in April 1998. No member of the PRC, and no Superintendent, at SCI-Greene or elsewhere, has ever recommended that Shoats be released to the general prison population. Thus, we hold that Shoats' "bias" argument is without foundation.

Shoats' confinement in administrative custody has been, in accordance with the DOC regulations, reviewed every month by the PRC and the Superintendent. Furthermore, Shoats has been given the opportunity to present his views personally at each review. See A85-86. In effect, the record demonstrates that Shoats' continued placement in administrative custody is supported by evidence sufficient to pass constitutional muster. Because Shoats has failed to provide any support for his assertions that his PRC reviews were constitutionally inadequate, we hold that the periodic reviews conducted by the PRC here comport with the minimum constitutional standards for due process.

III.

Accordingly, we affirm the district court's decision.

12

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

13