Ronald CLARK, William Wallace, Jr., Jerome Gibson, Ernest Porter, Ronald Collins, Robert L. Cook, Jr., and Lawrence Smith, Appellants

v.

Jeffrey A. BEARD, Secretary of D.O.C., William S. Stickman, Louis S. Folino, Kenneth Miller, Brenda Martin, Mary Ann Mistrik, Sandra Vuvnovic, Craig Harris, Ms. Balisteiri, Paul J. Stowitzky, Michael C. Barone, Diane Thomas, Sharon D'Eletto, Jean Mears, Dan Davis, Bonnie Lindley, Dr. Finley, Robert Tretinik, Susan Croftcheck, John Doe, & Jane Doe, (Numbers 1 through 99) et al.

Commonwealth Court of Pennsylvania.

Argued Oct. 17, 2006.

Decided Feb. 13, 2007.

Rehearing Denied En Banc
April 10, 2007.

Teri B. Himebaugh, Schwenksville, for appellants.

Vincent R. Mazeski, Camp Hill, for appellees.

BEFORE: FRIEDMAN, Judge, LEADBETTER, Judge, LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Ronald Clark, William Wallace, Jr., Jerome Gibson, Ernest Porter, Ronald Collins, Robert L. Cook, Jr. and Lawrence Smith (Appellants) appeal from an order of the Court of Common Pleas of Greene County (trial court) dismissing Appellants' complaint. In doing so, the trial court sustained a preliminary objection in the nature of a demurrer filed by the Secretary of Corrections and various employees of the Department of Corrections ("Department Defendants" or "Department"). Appellants claim that the Department Defendants are unlawfully detaining them in the Capital Case Units in two of the Commonwealth's State Correctional Institutions (SCI) despite the fact that their death sentences have been vacated. In this case we consider whether Appellants have pleaded legally cognizable claims for mandamus relief and compensatory damages.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellants were all sentenced to death for serious criminal offenses and are currently incarcerated in the Capital Case Unit at SCI–Greene or SCI–Graterford. Several Appellants initiated actions in the trial court in 2004 with at least one, Ronald Clark, filing a petition for writ of habeas corpus. The gravamen of these various actions was that each Appellant had his death sentence vacated or overturned but the Department continued his confinement in the Capital Case Unit.

In early 2005, Appellants filed a complaint, entitled "civil action in mandamus," in this Court's original jurisdiction against the Department Defendants. Appellants sought money damages as well as a writ of mandamus directing their immediate release into the general prison population. Because Appellants sought compensatory damages, this Court transferred the matter to the trial court by order of February 2, 2005. That order was subsequently vacated. Upon further review, we determined that this Court lacked original jurisdiction over such claims:

> Here, [Appellants'] request for damages and request for mandamus relief both rest on the allegation that the Department is intentionally and/or negligently harming them by keeping them on death row. Therefore, [Appellants'] action in equity, the request for mandamus, stems from the Department's alleged tortious conduct. Following Stackhouse,[1] we conclude that [Appellants'] petition for review sounds in trespass and that this court lacks original jurisdiction over the matter.

Clark, et al. v. Beard, et al. (No. 53 M.D. 2005, filed August 31, 2005), at 4–5 (footnote omitted). Accordingly, we sustained the Department's preliminary objection to this Court's original jurisdiction and transferred the matter back to the trial court.

---

1. Stackhouse v. Pennsylvania State. Police, 574 Pa. 558, 832 A.2d 1004 (2003) (when a complaint sets forth multiple counts which include both actions in trespass and suits in equity, the court must look to the substance of the complaint to determine its nature).

On October 6, 2005, the trial court entered an order consolidating Appellants' case with several other claims raising the identical issue. Appellants filed an amended complaint on October 31, 2005, that was identical to the original complaint in all important respects. Appellants averred that prisoners assigned to the Capital Case Unit are held in solitary confinement; have limited hours of non-contact visitation; are given ten hours of exercise per week in a small cage; are allowed no indoor exercise; can make only three fifteen-minute phone calls per week; and most have no opportunities to work or to participate in educational or rehabilitative programming. Amended Complaint, ¶ 8. Appellants also averred that they suffer from poor health due to long-term confinement in small cells, lack of normal mobility and lack of sunshine. *Id.* Appellants alleged that these conditions are appropriate for some inmates in the Capital Case Unit, but not for those inmates whose death sentences have been vacated. Amended Complaint, ¶ 9. Appellants fall into this latter category, because their death sentences have been vacated by a court of competent jurisdiction.[2] Amended Complaint, ¶ 4. Nevertheless, the Department has refused to reassign Appellants from the Capital Case Unit into the general prison population.

In their prayer for relief, Appellants requested monetary damages in an amount sufficient to compensate them for the pain and mental anguish they suffered due to the "deliberate indifference and intentional misconduct ... [or] negligence" of the Department Defendants in failing to release them from the Capital Case Unit. Amended Complaint at 6–7.[3] Appellants also sought an order directing the Department to reassign them, immediately, to the general prison population and to revise its "illegal" policies regarding housing of inmates whose death sentences have been vacated. *Id.* at 7.

The Department Defendants filed a preliminary objection in the nature of a demurrer, contending that Appellants failed to state a claim against any of them upon which relief could be granted. The trial court held, as a matter of law, that Appellants have no clear legal right to be housed outside of the Capital Case Unit and, concomitantly, that the Department has no corresponding duty to assign them to any particular area of the prison. For these reasons the trial court concluded that Appellants failed to state a claim for mandamus relief or for compensatory damages and sustained the demurrer. This appeal followed.[4]

2. Several of the individual Appellants filed affidavits with the trial court describing when their death sentences were vacated and the particular grievance process that each followed. It is not clear from the record before us, however, that litigation in each Appellant's case has ended. The Department certainly does not concede this point and maintains that each Appellant is actively litigating his criminal case. The trial court assumed for purposes of its review that each Appellant is now in a position where a death sentence cannot be reimposed, that each Appellant has requested a transfer out of the Capital Case Unit, that the Department has denied or ignored the request, and that each Appellant

has exhausted all administrative remedies available to him.

3. Appellants' original complaint sought a monetary award of at least $50,000 per Appellant.

4. A preliminary objection in the nature of a demurrer admits every well-pleaded fact in the complaint and all inferences reasonably deducible therefrom. *Composition Roofers Local 30/30B v. Katz*, 398 Pa.Super. 564, 581 A.2d 607, 609 (1990). It tests the legal sufficiency of the challenged pleadings and will be sustained only in cases where the pleader has clearly failed to state a claim for which relief

## NATURE OF APPELLANTS' ACTION

Appellants' action, as noted by the trial court and this Court in its prior opinion, proceeds along two tracks. First, Appellants seek mandamus relief in the form of an order directing the Department Defendants to release them from the Capital Case Unit into the general population and to institute a new policy for prisoners similarly situated to Appellants.[5] Second, Appellants seek compensatory damages for the pain and mental anguish they have allegedly suffered as a result of their continued confinement in the Capital Case Unit after their death sentences were vacated. In this appeal from a demurrer, we must determine whether Appellants stated legally cognizable causes of action. We consider, first, whether the Appellants have a clear right to a writ of mandamus to enforce a duty of the Department Defendants arising from the applicable capital punishment statute or arising from Appellants' purported liberty interest. Next, we consider whether the allegations in the complaint state a cause of action for compensatory damages.[6]

## MANDAMUS

Mandamus is an extraordinary writ that lies to compel an official's performance of a ministerial act or mandatory duty where there is a clear legal right in the plaintiff, a corresponding duty in the defendant, and want of any other appropriate and adequate remedy. *Pennsylvania Dental Association v. Insurance Department*, 512 Pa. 217, 227, 516 A.2d 647, 652 (1986). Mandamus is not used to direct the exercise of judgment or discretion of an official in a particular way. *Id.* at 228, 516 A.2d at 652. Furthermore, the purpose of mandamus is not to establish legal rights, but to enforce those rights which are already established. *Jamieson v. Pennsylvania Board of Probation and Parole*, 90 Pa.Cmwlth. 318, 495 A.2d 623, 625 (1985). Mandamus will not issue to compel a defendant to do that which is illegal, invalid or in violation of a statute. *Id.* at 625–626. Finally, mandamus is not a proper vehicle for challenging the constitutionality of a statute, regulation or policy. *Waters v. Department of Corrections*, 97 Pa.Cmwlth. 283, 509 A.2d 430, 433 (1986).

can be granted. *Id.* When determining whether a preliminary objection in the nature of a demurrer was properly granted, an appellate court must accept as true all properly pleaded material facts. *Id.* We must confine our analysis to the complaint and decide whether sufficient facts have been pleaded to permit recovery if the facts are ultimately proven. *Id.* The demurrer may be granted only in cases which are so free from doubt that a trial would certainly be a fruitless exercise. *Id.*

5. In their brief to this Court, Appellants seek reinstatement of their action and "appropriate *injunctive* and compensatory relief." Appellants' Brief at 21 (emphasis added). Whether Appellants are actually seeking a writ of mandamus or an injunction, their threshold burden is the same; they must establish a clear legal right to relief. *Garber v. Department of Corrections*, 851 A.2d 222, 225 (Pa.Cmwlth.2004). Because Appellants seek

to compel affirmative action by prison officials acting in their official capacities, we agree with the Department's premise, and that of the trial court, that the first part of their action is one in mandamus. *Id.*

6. We recognize that this Court normally exercises exclusive original jurisdiction over actions in mandamus against the Commonwealth and any officer thereof acting in his official capacity. 42 Pa.C.S. § 761(a)(1). The second part of Appellants' action, which sounds in trespass, lies within this Court's appellate jurisdiction. 42 Pa.C.S. § 761(a)(1)(v). In light of this Court's prior order transferring the entire matter to the trial court, which is now the law of the case, our scope of review is to determine whether the trial court abused its discretion in denying mandamus relief. *Porter v. Bloomsburg State College*, 450 Pa. 375, 377, 301 A.2d 621, 622 (1973).

With the foregoing principles in mind, we turn to Appellants' claim for mandamus relief. Appellants aver that, because their death sentences have been vacated by court orders, they have a clear legal right to be removed from the Capital Case Unit, and the Department Defendants have a corresponding duty to reassign them to the general population. The Department Defendants respond that no inmate has any right to pick the place of his incarceration, under statute or under the U.S. Constitution.

### Act of June 18, 1998, P.L. 622, No. 80

When a criminal defendant is sentenced to death, the governor is required, by statute, to issue an execution warrant within 90 days specifying a day for execution which shall be no later than 60 days after the date the warrant is signed. Section 2(a) of the Act of June 18, 1998, P.L. 622, No. 80, 61 P.S. § 3002(a) (Act 80).[7] Then,

*[u]pon receipt of the warrant, the [Department] shall, until infliction of the death penalty or until lawful discharge from custody, keep the inmate in solitary confinement.* During the confinement, no person except the staff of the department, the inmate's counsel of record or other attorney requested by the inmate and a spiritual adviser selected by the inmate or the members of the immediate family of the inmate shall be allowed access to the inmate without an order of the sentencing court.

Section 3 of Act 80, 61 P.S. § 3003 (emphasis added). The Department argues that upon receiving execution warrants for each Appellant, it was required by Act 80 to place each Appellant in the solitary confinement of the Capital Case Unit. The question, then, is how Act 80 governs their placement after their death sentences are vacated.

According to Section 3 of Act 80, the only way out of the Capital Case Unit, besides execution, is a "discharge from custody." *Id.* Read literally, "discharge from custody" would occur when the inmate's conviction is overturned or pardoned. The Department, however, reads "discharge from custody" differently. It reads "discharge from custody" to mean discharge from custody in the Capital Case Unit when deemed appropriate, in the Department's discretion. The Department exercises its discretion by keeping inmates convicted of a capital offense in the Capital Case Unit while their death sentences are litigated. Once an inmate's death sentence is changed to another sentence as a consequence of his post-conviction appeals, the inmate is eligible to be moved from the Capital Case Unit. However, as long as there is a possibility that a death sentence will be reimposed, the Department confines that inmate to the Capital Case Unit.

The dissent contends that Section 3 of Act 80 *requires* the removal of an inmate from the Capital Case Unit once a warrant expires. This reading of the statute is unsupportable.

 First, it is entirely a matter of the Department's discretion where to house an inmate. Under the Department's regulation, an "inmate does not have a right to be housed in a particular facility or in a particular area within a facility." 37 Pa.Code § 93.11. Because Section 3 of Act 80 is silent about what happens when a warrant expires, in no way does it limit the Department's discretion on where to house that inmate. Mandamus does not lie to compel the Secretary and Department em-

---

7. The governor is further required to reissue an execution warrant if the date of execution passes without imposition of the death penalty, either because of a reprieve or a judicial stay of the execution. Section 2(a) of the Act of June 18, 1998, P.L. 622, 61 P.S. § 3002(a).

ployees to exercise their discretion in a particular way, even if the Court believes it has been exercised incorrectly. *Anderson v. Philadelphia*, 348 Pa. 583, 587, 36 A.2d 442, 444 (1944); *Chadwick v. Dauphin County Office of Coroner*, 905 A.2d 600, 604 (Pa.Cmwlth.2006).

Second, to the extent Section 3 of Act 80 restricts discretion, it does so in the opposite way supposed by the dissent. Once the governor signed an execution warrant for each Appellant, the Department was compelled by Section 3 to *remove* each Appellant from the general population. The warrant is the trigger for moving an inmate to the Capital Case Unit, but it is not the key to his continued stay there. Under the dissent's view, inmates convicted of capital crimes would move back and forth between the general population and the Capital Case Unit depending on the status of an execution warrant, which might be signed several times over the course of an inmate's post-conviction appeals. Section 3 of Act 80 does not direct, or even authorize, such an outcome.[8] To the contrary, the only occasion for a writ of mandamus to issue under Section 3 of Act 80 would be in the circumstance where, for some reason, a prisoner was not moved to the Capital Case Unit upon the governor's signature of an execution warrant.

■ Thus, for the foregoing reasons, we hold that the trial court properly sustained the Department Defendants' demurrer to Appellants' complaint insofar as it sought mandamus relief. Section 3 of Act 80 does not, as the dissent argues,

support the issuance of a writ of mandamus. Because a writ of mandamus would contradict Act 80, it would violate the principle that mandamus will not lie to compel a defendant to do that which is invalid under statute. *Jamieson*, 495 A.2d at 625.

## Protected Liberty Interest

In sustaining the preliminary objection, the trial court held that Appellants had failed to plead facts sufficient to show a liberty interest in being housed in a place other than the Capital Case Unit. In the absence of that showing, there was no duty of any Department Defendant that could be enforced by writ of mandamus. We agree with the trial court's analysis.

■ In determining whether Appellants have asserted a protected liberty interest, we begin by noting that matters of prison management are uniquely the province of the executive and legislative branches of government. *Martin v. Jeffes*, 93 Pa.Cmwlth. 82, 501 A.2d 308, 310 (1985). For this reason, judges may not indiscriminately denominate the place a prisoner is housed; statutes and regulations establish the presumptive place of confinement. *Commonwealth v. Tuddles*, 782 A.2d 560, 563 (Pa.Super.2001). The courts of this Commonwealth and the federal courts have consistently held that prison officials have the authority to determine where a prisoner should be housed and that principles of due process impose few restrictions on the use of that authority. *Singleton v. Lavan*, 834 A.2d 672, 675 (Pa.Cmwlth. 2003).

---

**8.** The dissent concedes that if the Department has a valid penological reason to keep Appellants in the Capital Case Unit, it may do so. It reads the complaint as establishing the reasonable inference that the Department has no valid reason. The inference drawn is a legal conclusion, not a factual inference. Further, it places, improperly, the burden upon the Department to prove the constitutionality of its policy with respect to the housing of inmates convicted of capital offenses. *Overton v. Bazzetta*, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003); *Garber v. Department of Corrections*, 851 A.2d 222, 227 (Pa.Cmwlth.2004).

In *Singleton,* an inmate was placed into a restricted housing unit (RHU) after he refused to provide a DNA sample. Although his primary challenge before this Court went to the constitutionality of the DNA Act, 42 Pa.C.S. §§ 4701–4741, Singleton also requested a preliminary injunction enjoining the Department from changing his custody level. In rejecting Singleton's claim as not legally cognizable, we noted that the restrictions placed on him were customary for all inmates placed in the RHU, and that "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Singleton,* 834 A.2d at 675–676 (citing *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). *See also Chem v. Horn,* 725 A.2d 226, 229 (Pa.Cmwlth.1999) (rejecting prisoner's due process claim based upon, *inter alia,* transfer to a RHU following a positive drug test result because "remaining in a prison's general population is not a protected liberty interest.") (citing *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).

The United States Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), cited in both of the above-referenced Commonwealth Court opinions, is instructive. In *Sandin,* the Supreme Court examined the circumstances under which state prison regulations afford inmates a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. Conner, an inmate at a Hawaii prison, was placed into disciplinary segregation for 30 days following an altercation with prison officials. He filed suit seeking injunctive relief and damages for, *inter alia,* a deprivation of procedural due process in connection with his disciplinary hearing.

The Supreme Court devoted much of its analysis to clarifying the proper analytical framework for these types of claims, noting that previous decisions had impermissibly shifted the focus of the liberty interest inquiry from one based on the nature of the deprivation to one based on language of a particular prison regulation. Eschewing the increasing involvement of federal courts in the day-to-day management of prisons, the Court announced that the time had come to return to the due process principles established in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Accordingly, the Court held:

> Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause.... But *these interests will be generally limited to freedom from restraint which,* while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless *imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*

*Sandin,* 515 U.S. at 483–484, 115 S.Ct. 2293 (citations omitted) (emphasis added). Applying the above principles, the Court concluded that Conner's segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest. *Id.* at 486, 115 S.Ct. 2293.

Based upon the foregoing authority, it is apparent that Appellants' Amended Complaint has failed to plead that they have a protected liberty interest in being confined outside of the Capital Case Unit. Their complaint describes the conditions in the Capital Case Unit, but it is devoid of any baseline against which to measure

those conditions and determine whether they pose an "atypical and significant hardship." For example, Appellants do not describe any of the conditions in the general population that they presumably believe are less restrictive. Nor do Appellants aver that the conditions of confinement in the Capital Case Unit are any more restrictive than other types of segregated housing at SCI–Greene or SCI–Graterford. In short, a fair reading of Appellants' complaint does not indicate how confinement in the Capital Case Unit imposes atypical and significant hardships on Appellants in relation to the ordinary incidents of prison life.

Appellants rely extensively on the United States Supreme Court's decision in *Wilkinson v. Austin*, 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). We have reviewed *Wilkinson* and find that it does not advance Appellants' case. In *Wilkinson*, a group of former and current inmates housed at Ohio's highest security "Supermax" (OSP) facility brought a class action against prison officials under 42 U.S.C. § 1983 alleging that the state's policy governing placement in the facility violated the Fourteenth Amendment by not affording procedural due process. Applying its earlier decision in *Sandin*, the Court determined that the inmates first had to demonstrate that assignment to the supermax facility imposed atypical and significant hardship on them in relation to the ordinary incidents of prison life. *Wilkinson*, 545 U.S. at 223, 125 S.Ct. 2384 (citing *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293).

The Court noted that in the wake of *Sandin* the Courts of Appeal had not reached consistent conclusions for "identifying the baseline from which to measure what is atypical and significant in any particular prison system." *Id.* Rather than establishing such a baseline, the Court concluded, based upon the specific conditions at Ohio's supermax facility, that the inmates in *Wilkinson* had satisfied their burden of demonstrating a "liberty interest in avoiding assignment to OSP." *Id.* at 224, 125 S.Ct. 2384.[9] The Court then addressed the central question, which was "what process is due an inmate whom Ohio seeks to place in OSP." *Id.* On that point, the Supreme Court held that Ohio's procedures were adequate to "safeguard an inmate's liberty interest in not being assigned to OSP." *Id.* at 228, 125 S.Ct. 2384.

The *Wilkinson* decision did not change or limit the fundamental principle the Supreme Court established in *Sandin*. Indeed, the Supreme Court confirmed that the "touchstone" of the *Sandin* analysis, *i.e.*, comparing the challenged prison condition to the ordinary incidents of prison life, was the appropriate analysis to follow in such cases. *Id.* at 223, 125 S.Ct. 2384. In finding that the conditions at the Ohio supermax facility imposed an atypical and significant hardship on plaintiffs, the Supreme Court relied upon three factors: (1) the extreme conditions imposed upon the inmates, which deprived them of almost any environmental or sensory stimuli and of almost all human contact;[10] (2) the indefinite duration of placement in the su-

---

**9.** Notably, in *Wilkinson*, the complaint contained allegations to show how the conditions in the supermax facility were "atypical" in comparison to other Ohio prisons. *Wilkinson*, 545 U.S. at 214, 125 S.Ct. 2384.

**10.** The Court described the conditions at the supermax facility (OSP) as follows:

*Conditions at OSP are more restrictive than any other form of incarceration in Ohio,*

*including conditions on its death row or in its administrative control units.* The latter are themselves a highly restrictive form of solitary confinement.... In the OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to

permax facility; and (3) the automatic disqualification of eligibility for parole consideration. *Wilkinson*, 545 U.S. at 223–224, 125 S.Ct. 2384. Significantly, the Court noted that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224, 125 S.Ct. 2384.

Appellants focus on the allegedly indefinite duration of their confinement in the Capital Case Unit, but the Supreme Court held this factor is not sufficient in and of itself to create a protected liberty interest within the correctional facility context. Duration must be coupled with the two other factors in *Wilkinson*, both of which are absent in the case *sub judice*. In any case, under the Department's construction of Section 3 of Act 80, duration is not indefinite. An inmate successful in having his capital punishment replaced by another sentence is eligible to be discharged from custody in the Capital Case Unit.

With respect to the extreme conditions in the supermax facility, the Supreme Court observed that those conditions were more restrictive than any other form of incarceration in Ohio, "including conditions on its death row or in its administrative control unit." *Wilkinson*, 545 U.S. at 214, 125 S.Ct. 2384. Thus, in order for *Wilkinson* to fall "on all fours" with this or any other place of confinement case, the prisoners must complain of conditions more onerous than we would expect to find in other types of segregated housing, including the Capital Case Unit. The third factor identified in *Wilkinson*, that placement in the supermax facility automatically rendered the inmates ineligible for parole consideration, is, as Appellants acknowledge, not an issue in this case. Appellants will likely be serving life sentences and will therefore be ineligible for parole under Pennsylvania law regardless of their place of confinement. Appellants' Brief at 16.[11]

In sum, we hold that Appellants failed to establish a liberty interest in being housed outside the Capital Case Unit. The trial court properly dismissed their claim.

## COMPENSATORY DAMAGES

Appellants' Amended Complaint also includes a trespass claim for compensatory

---

shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

*Wilkinson*, 545 U.S. at 214, 125 S.Ct. 2384 (emphasis added).

11. *Wilkinson* is also distinguishable from the instant case because the constitutional due process inquiry in *Wilkinson* focused on Ohio's procedures for assigning or transferring inmates to the supermax facility. Here, assuming *arguendo* that Appellants had asserted a protected liberty interest, their complaint does not indicate how they were deprived of due process of law. Appellants were all sentenced to death, presumably after a trial by jury, and an execution warrant was signed for each of them. At that point, as discussed previously in this opinion, the Department had no discretion over where to house them. By statute it had to place them in the Capital Case Unit. Moreover, although Appellants allege that their individual grievances to prison officials were either denied or ignored, they seem dissatisfied with the result of the grievance process, not with the process itself. Appellants have failed to aver how due process was lacking.

damages. Appellants aver that it is not "cruel and unusual punishment" to place inmates under a death sentence in the Capital Case Unit, but it becomes cruel and unusual once a court of competent jurisdiction has vacated their death sentences. Amended Complaint, ¶ 9. Appellants also aver that they are not receiving "proper treatment" for the pain and suffering "they [are] experiencing . . . while being held on death row although . . . their death sentences were vacated." Amended Complaint, ¶ 12. Nowhere does the Amended Complaint refer to any provision of the United States Constitution. Nevertheless, Appellants assert in their brief that they have a right to injunctive and compensatory relief under the Due Process Clause of the Fourteenth Amendment and under the Eighth Amendment.[12] The dissent agrees and would allow the case to proceed under 42 U.S.C. § 1983. There are several problems with the dissent's approach.

First, as explained above, the Appellants have failed to plead facts that are necessary to show that they have a liberty interest in being housed outside the Capital Case Unit. This is because there are no allegations to meet the touchstone of a liberty interest: that the housing there is an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293. Accordingly, the Amended Complaint does not state a claim under the Due Process Clause of the Fourteenth Amendment.

Second, Appellants' complaint cannot be fairly read to include an Eighth Amendment claim. Appellants do not challenge the conditions in the Capital Case Unit, such as the quality of medical care available to inmates there; rather, they challenge their continued placement in the Capital Case Unit after their death sentences have been vacated. Amended Complaint, ¶ 9. Their assertions regarding the pain and anguish of being in the Capital Case Unit after their death sentences were vacated are just another way of stating that they are being held in the wrong place. Amended Complaint, ¶ 12. The Amended Complaint does not come close to pleading a disregard of a prisoner's need for medical care under *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The complaint contains no specifics on what medical care has been demanded by Appellants and refused by the Department.

■ Third, a 42 U.S.C. § 1983 action has pleading requirements. The complaint must state that the defendant, under color of state law, deprived the plaintiff of a right, privilege or immunity guaranteed by federal statutory or constitutional law. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The Amended Complaint is silent on these points and on any specific acts of any of the Department Defendants. In *Evancho v. Fisher*, 423 F.3d 347 (2005), the Third Circuit Court of Appeals dismissed a complaint, which at least cited to Section 1983 and to the federal right sought to be vindicated, as inadequately pled, even under the more liberal notice pleading required in our federal courts. In spite of the Amended Complaint's glaring omissions, the trial court gave a generous read, treating it as raising a protected liberty interest, as argued by Appellants' counsel in their brief. As demonstrated above, however, the Amended Complaint fails to plead facts sufficient to support a finding that Appel-

12. Appellants' brief does not even address whether they have a right to a writ of mandamus, and their reply brief is silent on Section 3 of Act 80, 61 P.S. § 3003.

lants have a liberty interest in being assigned to the general population.

For these reasons, the Amended Complaint cannot be fairly read to state a Section 1983 claim.

## CONCLUSION

Appellants have failed to establish a clear legal right to relief on which a writ of mandamus could lie. Their demand to be transferred out of the Capital Case Unit would, in fact, require the Department to violate its statutory duty to hold them there. They have also failed to file a complaint that identifies a protected liberty interest. Thus, because Appellants failed to state any claim upon which relief could be granted, we affirm the trial court's order sustaining the preliminary objection of the Department.[13]

## *ORDER*

AND NOW, this 13th day of February, 2007, the order of the Court of Common Pleas of Greene County in the above-captioned matter, dated March 16, 2006, is AFFIRMED.

## DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent. The majority affirms the order of the Court of Common Pleas of Greene County (trial court), which sustained a demurrer to Appellants' complaint filed by various officers and employees of the Department of Corrections (Department). In doing so, the majority holds that: (1) death row inmates whose death sentences have been vacated and whose execution warrants have expired do not have a clear legal right to be released from death row; and (2) such inmates cannot obtain damages for the injuries they have sustained during solitary confinement on death row because they do not have a protected liberty interest in not being confined on death row for an indefinite duration after their death sentences have been vacated. For the following reasons, I disagree.

### I. Facts

As the majority properly indicates, a preliminary objection in the nature of a demurrer admits the well-pled facts in the complaint and all inferences reasonably deducible therefrom. Moreover, in ruling on a demurrer, a court must confine its analysis to the complaint. (Majority op. at 158 n. 4) (citing *Composition Roofers Local 30/30B v. Katz*, 398 Pa.Super. 564, 581 A.2d 607 (1990)). In their complaint, Appellants allege the following facts.

Appellants are death row inmates whose death sentences have been vacated. The Department is aware that the death sentences have been vacated, but the Department is keeping Appellants on death row. Death row is solitary confinement.[1] Inmates on death row have limited non-con-

---

**13.** Before this Court, the Department argues that Appellant Ronald Clark lacks standing to represent other inmates in the Capital Case Unit. This issue is rendered moot by our decision affirming the trial court's order on the merits.

**1.** Pursuant to section 3 of the Act of June 18, 1998, P.L. 622, 61 P.S. § 3003, upon receipt of a warrant of execution, the Department shall keep the inmate in solitary confinement.

During the confinement, no person except the staff of the [D]epartment, the inmate's counsel of record or other attorney requested by the inmate and a spiritual advisor selected by the inmate or the members of the immediate family of the inmate shall be allowed access to the inmate without an order of the sentencing court.

61 P.S. § 3003.

tact visitation rights, ten hours of exercise per week in a small cage, no outdoor exercise,[2] three fifteen-minute phone calls per week, no opportunity to work and no participation in group, educational or rehabilitation programs. The Department's keeping of Appellants in solitary confinement on death row for an indefinite duration has caused them to suffer from poor physical health and psychological trauma.

In their prayer for relief, Appellants seek damages in an amount that the court finds sufficient to compensate them for the pain and mental anguish they have suffered as a result of the duration of their solitary confinement on death row. In addition, because the duration of their solitary confinement on death row has caused them physical and psychological harm, Appellants seek an order directing the Department to release them from death row and to revise the policy of keeping inmates on death row after their death sentences have been vacated. (R.R. at 13–14, 18.)

## II. Mandamus

Appellants allege that, because their death sentences have been vacated by court orders, they have a clear right to be removed from solitary confinement on death row, and the Department has a corresponding duty to remove Appellants from solitary confinement on death row.[3]

A sentence of death is subject to automatic review by our supreme court. Section 9711(h)(1) of the Sentencing Code, 42 Pa.C.S. § 9711(h)(1). If a sentence of death is upheld by our supreme court, the prothonotary transmits a full record of the proceedings to the Governor. Section 9711(i) of the Sentencing Code, 42 Pa.C.S. § 9711(i). Unless a pardon or commutation of sentence has been issued, the Governor issues a warrant of execution within ninety days that specifies a day for execution, which shall be no later than sixty days after the warrant is signed. Section 2(a) of the Act of June 18, 1998, P.L. 622, 61 P.S. § 3002(a). The Governor must *reissue* a warrant specifying a new execution date if the following occur: (1) the date of execution passed without imposition of the death penalty because of a reprieve[4] or a judicial stay; (2) a pardon or commutation was not issued; and (3) the Governor received notice that a reprieve or judicial stay has terminated. *Id.*

The warrant is directed to the Secretary of Corrections, commanding that the subject of the warrant be executed on the day named in the warrant. 61 P.S. § 3002(b). *"Upon receipt of the warrant,* the [Secretary of Corrections] shall, until infliction of the death penalty or until lawful discharge

---

**2.** The complaint actually avers that there is no "indoor" exercise; however, having alleged that death row inmates exercise ten hours per week in a small cage, which is indoor exercise, I reasonably infer that there is no "outdoor" exercise.

**3.** I do not entirely agree with the majority's statement of the law governing mandamus. (*See* Majority op. at 159.) I disagree that mandamus is not a proper vehicle for challenging the constitutionality of a statute. In *Coady v. Vaughn,* 564 Pa. 604, 770 A.2d 287 (2001), our supreme court held that mandamus is a viable means for challenging the constitutionality of a statute on *ex post facto*

grounds. I also disagree that mandamus can never lie to compel an official to exercise discretion in a particular way. In *Duncan Meter Corporation v. Gritsavage,* 361 Pa. 607, 65 A.2d 402 (1949), our supreme court stated that mandamus will lie to compel proper action where an official has abused his or her discretion.

**4.** The Governor has the power to grant reprieves under Article IV, Section 9(a) of the Pennsylvania Constitution. *Morganelli v. Casey,* 163 Pa.Cmwlth. 538, 641 A.2d 674 (1994). A reprieve stays a death warrant in a particular proceeding for a period of time. *Id.*

from custody, keep the inmate in solitary confinement." 61 P.S. § 3003 (emphasis added). The majority interprets this quoted language from 61 P.S. § 3003 to mean that the "only way out of [death row], besides execution, is a 'discharge from custody.'" (Majority op. at 160.) In other words, the majority recognizes only two possibilities once the Department receives an execution warrant; either the inmate will be executed or the inmate will be totally exonerated or pardoned.[5] For the following reasons, I disagree.

Any warrant that the Secretary of Corrections receives under 61 P.S. § 3003 expires after the execution date has passed. *See Commonwealth v. Morris*, 565 Pa. 1, 38, 771 A.2d 721, 743 (2001) (J. Castille, concurring) (stating that a "stay that persists beyond the time fixed by the warrant invalidates that warrant—finally, totally, and permanently."). Indeed, under 61 P.S. § 3002(a), if the date of execution passes without imposition of the death penalty, the Governor must issue a second warrant that establishes a new execution date. Thus, in my view, the Secretary of Corrections only has authority under 61 P.S. § 3003 to keep a death row inmate in solitary confinement *upon receipt and continued possession of a valid warrant.*[6]

Here, because court orders have vacated Appellants' death sentences, the warrants that served as the authority for the holding of Appellants on death row have expired and have become *finally, totally and permanently invalid.* Thus, the Secretary of Corrections is no longer in receipt of a valid warrant. Absent a valid warrant, the Secretary of Corrections no longer has authority under 61 P.S. § 3003 to keep Appellants on death row.

Nevertheless, the Secretary of Corrections can keep Appellants on death row if there is a penological reason for doing so. However, in considering the Department's demurrer, we must accept as true the reasonable inference that the Department lacks any penological reason for keeping Appellants on death row.[7] Because the Secretary of Corrections has no statutory authority or penological reason for keeping Appellants on death row, I would conclude that Appellants have a clear legal right to be removed from death row and that the Department has a corresponding duty to remove them.[8]

5. The majority states that, according to the Department, a "discharge from custody" occurs when the Department removes an inmate from death row after the Department decides that a death sentence is no longer a possibility. (Majority op. at 160.) The majority expresses no agreement or disagreement in this regard. I point out that moving an inmate from death row to the general prison population is **not** a "discharge from custody." There is no question that the inmate is still in custody.

6. I submit that the majority's interpretation, which allows the Secretary of Corrections to keep an inmate in solitary confinement on death row based on an expired warrant, is absurd and unreasonable. Under section 1922(1) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922(1), we must presume

that the General Assembly did not intend a result that is absurd or unreasonable.

7. Indeed, Appellants are not in solitary confinement as a result of disciplinary action taken against them by the Department. I note that, according to the majority, whether a **valid** penological reason exists to keep an inmate on death row is a conclusion of law. (Majority op. at 161 n. 8.) However, I reasonably infer that there is no penological reason of any kind to keep Appellants on death row, which is a question of fact.

8. The majority states, "it is entirely a matter of the Department's discretion where to house an inmate." (Majority op. at 160.) However, under 61 P.S. § 3003, upon receipt of an execution warrant, the Department "shall" keep an inmate in solitary confinement. Thus, I submit that the majority's statement is incorrect.

## III. Constitutional Torts

A person may seek damages in a state court under 42 U.S.C. § 1983 for a violation of constitutional rights, and the individual need not specifically allege in the complaint that the action is brought under that provision. *Owens v. Shannon*, 808 A.2d 607 (Pa.Cmwlth.2002). To state a claim under 42 U.S.C. § 1983, the plaintiff must allege the violation of a constitutional right by a person acting under the color of state law. *Id.*

### A. Due Process

Appellants argue in their brief that their complaint sets forth an action for damages against the Department based on a violation of their constitutional right to procedural due process, i.e., keeping Appellants in solitary confinement on death row for an indefinite duration without a meaningful opportunity to be heard.[9] With respect to one of the Appellants, an inmate who has been adjudged ineligible for the death penalty due to mental retardation, Appellants argue that there can be no valid reason for keeping him on death row.

Procedural due process rights are triggered by a deprivation of a cognizable liberty interest. *Brown v. Blaine*, 833 A.2d 1166 (Pa.Cmwlth.2003). An inmate has a protected liberty interest in avoiding restrictive conditions of confinement where the conditions impose atypical and significant hardship in relation to the ordinary incidents of prison life. *Wilkinson v. Austin*, 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (citing *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).

The U.S. Supreme Court has not resolved the issue of identifying the appropriate baseline from which to measure what is atypical and significant in any particular prison system, and the federal appeals courts have not been consistent in this regard. *Wilkinson.* Nevertheless, the U.S. Supreme Court held in *Wilkinson* that inmates have a protected liberty interest in avoiding restrictive conditions of confinement "under *any* plausible baseline" where: (1) the state has imposed solitary confinement; (2) the confinement

---

To the extent that the Department has discretion with respect to the housing of death row inmates whose death sentences have been vacated and whose execution warrants have expired, I submit that the Department abuses its discretion by keeping such inmates in solitary confinement on death row without due process. In fact, the Department's own regulation at 37 Pa.Code § 97.11(b) states that the Department will "require due process in accordance with established principles of law" for inmates in restricted housing.

9. An inmate may file an action for damages against prison officials under 42 U.S.C.1983 for tort where: (1) the officials, acting pursuant to an established state procedure, deprive the inmate of life, liberty or property without due process; and (2) state tort remedies do not provide an adequate means for redress. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Here, Appellants allege that the Department deprived

them of a liberty interest pursuant to an established policy without due process. As the trial court notes, the Department would be immune from state tort action, (*see* trial ct. op. at 7 n. 4); thus, in this case, the state tort remedies would not provide Appellants an adequate means for redress.

Sovereign immunity is not available as a defense in an action under 42 U.S.C. § 1983. *Owens.* However, prison officials do have qualified immunity in actions for damages under 42 U.S.C. § 1983. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Qualified immunity is available where the officials acted in good faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances. *Id.* Qualified immunity is not available if the officials knew or reasonably should have known that the action taken would violate the constitutional rights of the inmate. *Id.*

is of *indefinite duration;*[10] and (3) the confinement disqualifies an otherwise eligible inmate for parole. *Wilkinson,* 545 U.S. at 223, 125 S.Ct. 2384 (emphasis added).

In *Shoats v. Horn,* 213 F.3d 140 (3d Cir.2000), the U.S. Court of Appeals for the Third Circuit concluded that an inmate kept in administrative confinement for eight years without any prospect of release in the near future had a protected liberty interest in avoiding continued administrative confinement because the *duration and indefiniteness* of such confinement was atypical and imposed a significant hardship on the inmate in relation to the ordinary incidents of prison life. Thus, in determining whether an inmate has a protected liberty interest in avoiding solitary confinement, courts consider whether the solitary confinement exceeds similar confinement "in either *duration* or degree of restriction." [11] *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293.

Here, we must accept as true the reasonable inference that Appellants' solitary confinement on death row is of indefinite duration. Thus, pursuant to *Wilkinson, Sandin* and *Shoats,* Appellants' confinement is atypical and imposes a significant hardship in relation to the ordinary incidents of prison life as a matter of law. As a result, Appellants are entitled to a meaningful opportunity to be heard regarding the lack of a penological basis for their continued solitary confinement and the harm they suffered due to their continued solitary confinement.[12]

## B. Cruel and Unusual Punishment

Appellants allege in their complaint that the Department's deliberate indifference to their deteriorating physical and mental health constitutes cruel and unusual punishment.[13]

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the U.S. Supreme Court stated that the government has an obligation under the Eighth Amendment to provide medical care for those being punished by incarceration. The denial of medical care to a prisoner may result in pain and suffering that does not serve any penological purpose, and the infliction of unnecessary suf-

**10.** I note that when restricted housing is imposed as a sanction for misconduct, the inmate receives confinement in the restricted housing unit for a definite period of time. *See* 37 Pa.Code § 93.10 (imposing no more than ninety days for a Class I misconduct). Here, no date has been established for Appellants' release from solitary confinement, and no hearing has been set to consider their release; therefore, their confinement is indefinite.

**11.** The majority states that indefinite duration in solitary confinement, by itself, does not create a protected liberty interest. However, there can be no question that, at some point, the duration of an inmate's solitary confinement would become atypical and impose a significant hardship on the inmate. In *Shoats,* the inmate's duration in administrative custody was eight years, and the special assistant to the Department's Commissioner

conceded that that amount of time was atypical.

**12.** The majority states that Appellants have not alleged how the grievance process did not afford them due process. However, Appellants allege that their continued solitary confinement is pursuant to a Department death row policy. Unless the Department alters its death row policy, a result sought by Appellants here, any grievance would be futile.

**13.** This cause of action is different from the constitutional tort claims, which allege that the solitary confinement has *caused* Appellants to suffer physical and psychological harm. The cruel and unusual punishment cause of action alleges only that the Department is deliberately indifferent to Appellants' injuries.

fering is inconsistent with contemporary standards of decency. *Id.*

Thus, deliberate indifference to the serious medical needs of prisoners is proscribed by the Eighth Amendment. *Id.* This is true whether the indifference is manifested by prison doctors in their response to a prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Id.* "Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id.* at 105, 97 S.Ct. 285.

Here, we must accept as true the reasonable inference that Appellants suffer from serious illness or injury as a result of the Department's deliberate indifference to their deteriorating physical and mental health. Thus, pursuant to *Estelle,* Appellants have stated a cause of action for cruel and unusual punishment under the Eighth Amendment.[14]

Accordingly, I would reverse and remand for further proceedings.[15]

---

**14.** The majority states that Appellants' "assertions regarding the pain and anguish of being [on death row] after their death sentences were vacated is just another way of stating that they are being held in the wrong place." (Majority op. at 165.) I disagree that allegations of poor physical and mental health are equivalent to allegations of being held in the wrong place. By equating the two, the majority suggests that parts of a prison are designed to cause human illness and suffering and that this would not be cruel punishment.

**15.** I would direct that, on remand, the trial court provide Appellants with the opportunity to amend their complaint under Pa. R.C.P. No. 1033 to include separate counts for the various causes of action implicated by the well-pled facts.