IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Anthony Feliciano,                       :
                    Petitioner           :
        v.                               : No. 588 M.D. 2019
                                         : SUBMITTED: March 17, 2021
Pennsylvania Department                  :
of Corrections,                          :
                    Respondent           :


BEFORE:    HONORABLE P. KEVIN BROBSON, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge
           HONORABLE J. ANDREW CROMPTON, Judge


OPINION BY JUDGE CEISLER                         FILED:  April 13, 2021

        Petitioner Anthony Feliciano (Feliciano), an inmate currently incarcerated within the Commonwealth's state prison system at the State Correctional Institution at Mahanoy (SCI-Mahanoy), has filed a Petition for Review in this Court's original jurisdiction. He seeks a declaratory judgment establishing that Respondent, Pennsylvania Department of Corrections (Department), violated his procedural due process rights during the course of punishing him for a positive drug test. In response, the Department has filed preliminary objections, demurring to the Petition for Review and challenging our jurisdiction to consider this matter. For the reasons explained *infra*, we sustain the Department's preliminary objection to our jurisdiction and dismiss the Petition for Review without prejudice.

## I. Facts and Procedural History

In May 2019, Feliciano's urine was collected so that it could be tested for the presence of illicit substances. Pet. for Review, ¶5, Ex. A.[1] In August 2019, Phamatech Laboratories, located in San Diego, California, issued a report indicating that Feliciano's sample had tested positive for Buprenorphine[2] in the amount of 11 nanograms per milliliter. *Id.*, ¶6, Ex. A. As a consequence, Feliciano was placed in the Restricted Housing Unit (RHU) at SCI-Mahanoy on August 6, 2019. *Id.*, ¶7. Contemporaneously, the Department issued Misconduct Report D 198445 (first misconduct report) and allegedly served it on Feliciano. *Id.*, Ex. B.

In response, Feliciano filed an Official Inmate Grievance, numbered 817513 (first grievance), with the Department. *Id.*, Ex. C. Hearing Examiner F. Nunez dismissed the first misconduct report without prejudice on August 9, 2019. *Id.*, ¶10, Ex. D.[3] Despite Examiner Nunez's decision, the Department still rejected Feliciano's first grievance on August 12, 2019. *Id.*, Ex. C. Facility Grievance Coordinator Jane Hinman formally notified Feliciano that she had rejected the first

---

[1] Exhibit A, which is a printout of Feliciano's drug test results, indicates that urine was collected from Feliciano on July 29, 2019, not May 29, 2019. This discrepancy, however, has no bearing on our analysis in this matter.

[2] Buprenorphine is a medication approved by the Food and Drug Administration for treatment of opioid addiction and is intended for use in combination with counseling and behavioral therapy. *Buprenorphine*, U.S. DEP'T OF HEALTH & HUMAN SERVS., SUBSTANCE ABUSE AND MENTAL HEALTH SERVS. ADMIN., https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions/buprenorphine (last visited April 12, 2021). "[Buprenorphine] produces effects such as euphoria or respiratory depression at low to moderate doses . . . . Because of [B]uprenorphine's opioid effects, it can be misused, particularly by people who do not have an opioid dependency." *Id.* Buprenorphine is a Schedule III controlled substance under Pennsylvania law. *See* 28 Pa. Code § 25.72(d)(10).

[3] This Disciplinary Hearing Report lists the hearing date as being September 9, 2019. Pet. for Review, Ex. D. We believe this date to be a typographical error, in light of the sequence of events in this matter and Feliciano's statements in his Petition for Review, and that the actual date of this hearing was August 9, 2019.

grievance due to its nonconformance with the Department's administrative policies pertaining to "Inmate Discipline/Misconduct Procedures" and "Administrative Custody Procedures[.]" *Id.*, Ex. E. Coordinator Hinman directed Feliciano to discuss the grieved matter with SCI-Mahanoy's Program Review Committee (PRC). *Id.*[4]

Shortly thereafter, Feliciano filed a second Official Inmate Grievance on August 15, 2019, numbered 819156 (second grievance), which Coordinator Hinman appears to have rejected the following day. *Id.*, Ex. F.[5]

Feliciano promptly filed a third Official Inmate Grievance on August 20, 2019, numbered 820178 (third grievance). *Id.*, Ex. G. In his third grievance, Feliciano stated that he had not been given "any type of paperwork, misconduct, etc." regarding the disciplinary charges that had resulted in his placement in the RHU. *Id.* Feliciano claimed that the Department had consequently violated his due

---

[4] The Department has described the PRC as:

> [a] committee consisting of three (3) staff members that conducts Administrative Custody Hearings, periodic reviews, makes decisions regarding continued confinement in the [RHU] and/or Special Management Unit (SMU), and hears all first level appeals of misconducts. The committee shall consist of one staff member from each of the following classifications: Deputy Superintendent, who shall serve as the chairperson, Inmate Program Manager, Unit Manager, School Principal, Drug and Alcohol Treatment Specialist Supervisor, or Inmate Records Officer Supervisor and a Commissioned Officer. The Superintendent may designate other staff as committee members[;] however, if such designations are made, they must be in writing and the Superintendent must maintain a list of all designees. Whenever a [PRC] is convened, at least one (1) member of the committee must be a staff member who is not directly involved in the administration of the RHU/SMU in which the inmate is currently housed.

DEP'T OF CORR., DC ADM 004 (1999), https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/004%20Criminal%20Violations.pdf (last visited April 12, 2021).

[5] On the second grievance, the blank for the facility grievance coordinator's signature contains only the handwritten word "[r]eject." Pet. for Review, Ex. F.

process rights pursuant to the United States Constitution's Fifth, Eighth, and Fourteenth Amendments[6] and demanded "$30,000 for violated rights and pain and suffering." *Id.*

Five days later, Coordinator Hinman formally notified Feliciano that she had rejected his second grievance because it did not conform to the Department's administrative policies pertaining to "Inmate Discipline/Misconduct Procedures." *Id.*, Ex. H.

That same day, the Department issued Misconduct Report D 169129 (second misconduct report) and allegedly served it upon Feliciano. *Id.*, Ex. I. The second misconduct report stated, in relevant part:

> MISCONDUCT CHARGE OR OTHER ACTION[:] A. Class I. Charge #22[:] Possession or use of a dangerous or controlled substance.
>
> STAFF MEMBER'S VERSION[:]
>
> On July 29, 2019[,] . . . Feliciano . . . submitted a urine test to detect the presence of drugs in his system. The test sample was sent to [Phamatech] Laboratories . . . for analysis. On August 2, 2019[,] [Phamatech] Laboratories informed the institution that Feliciano's urine test was positive for the presence of Buprenorphine (11ng/mL). A [gas chromatography–mass spectrometry] retest of the sample indicated a positive result for Buprenorphine.
>
> Note: Date of report and date of incident differ due to original misconduct being dismissed without prejudice.
>
> IMMEDIATE ACTION TAKEN[:] Misconduct warranted. Not considered for informal resolution due to seriousness of charge. Refer to Hearing Examiner for further review.
>
> PREHEARING CONFINEMENT[:] "No."[7]

---

[6] U.S. CONST. amends. V, VIII, and XIV.

[7] It is not clear why this report states that Feliciano was not held in pre-hearing confinement, given that Feliciano was detained in restricted housing between August 6, 2019, the

4

*Id.* The second misconduct report also stated that a hearing regarding Feliciano's misconduct citations would potentially be held on or after August 24, 2019. *Id.*

On August 26, 2019, Examiner Nunez convened a disciplinary hearing regarding Feliciano's positive drug test. *Id.*, Ex. J. Feliciano pled not guilty. *Id.* However, Examiner Nunez determined that the allegations of the second misconduct report were supported by a preponderance of the evidence and found Feliciano guilty of misconduct. *Id.* As punishment, Examiner Nunez ordered Feliciano to serve 30 days in disciplinary custody, retroactive to August 6, 2019. *Id.*

The next day, Coordinator Hinman formally notified Feliciano that she had rejected his third grievance. *Id.*, Ex. K. Coordinator Hinman explained she had done so due to the third grievance's nonconformance with the Department's administrative policies pertaining to "Inmate Discipline/Misconduct Procedures" and "Administrative Custody Procedures[.]" *Id.* Coordinator Hinman again directed Feliciano to discuss the grieved matter with SCI-Mahanoy's PRC. *Id.*

Feliciano then filed his Petition for Review with our Court. In his Petition for Review, Feliciano claims he was punished for allegedly testing positive via urinalysis for Buprenorphine use. Pet. for Review, ¶¶5-17. Feliciano alleges that, prior to the August 26, 2019 misconduct hearing, he was not provided with the relevant misconduct paperwork or the urinalysis test results. *Id.*, ¶¶4, 18. He maintains that this withholding of critical evidence, as well as of the particulars regarding the violation for which he had been charged, deprived him of sufficient notice and "[prevented] him from marsha[l]ling the facts and prepar[ing] . . . a defense." *Id.*, ¶19. Feliciano seeks a judicial declaration that the Department was

---

date of the first misconduct report, and August 26, 2019, the date of the disciplinary hearing regarding Feliciano's positive drug test. *See* Pet. for Review, ¶7, Exs. B, C, F, I, and J. This factual discrepancy, however, does not affect the issues currently before us.

5

obligated to provide him with "copies of the misconduct [paperwork] and urine test results prior to the [August 26, 2019 misconduct] hearing" and that he be awarded "such other relief as may be just under the circumstances." *Id.*, Wherefore Clause, ¶¶1-3.

The Department filed preliminary objections and Feliciano responded in opposition. The matter is now ripe for our disposition.

## II. Standard of Review

> In ruling on preliminary objections, this Court accepts as true all well-pled allegations of material fact, as well as all inferences reasonably deducible from those facts. *Key v. Pa. Dep't of Corr.*, 185 A.3d 421 (Pa. Cmwlth. 2018). However, this Court need not accept unwarranted inferences, conclusions of law, argumentative allegations, or expressions of opinion. *Id.* For preliminary objections to be sustained, it must appear with certainty that the law will permit no recovery. *Id.* Any doubt must be resolved in favor of the non-moving party. *Id.*

*Dantzler v. Wetzel*, 218 A.3d 519, 522 n.3 (Pa. Cmwlth. 2019).

## III. Discussion

The Department asserts two arguments in support of its preliminary objections. First, the Department argues this Court lacks either appellate or original jurisdiction to consider the claims raised in Feliciano's Petition for Review. Second, the Department demurs to Feliciano's claims, contending he did not identify a liberty interest that was affected by the misconduct proceedings, and therefore, the Department was not obligated to afford him due process. Department's Br. in Support of Prelim. Objs at 7-8. We address these arguments in turn.

### A. Appellate Jurisdiction

We agree with the Department that this Court does not have appellate jurisdiction to consider Feliciano's Petition for Review. It is well settled that

"[i]nmate misconducts are a matter of internal prison management and, thus, do not constitute adjudications subject to appellate review." *Hill v. Dep't of Corr.*, 64 A.3d 1159, 1167 (Pa. Cmwlth. 2013). To the extent that Feliciano seeks appellate review of the Department's misconduct proceedings pertaining to his urine test and the related punishment imposed upon him, we sustain the Department's preliminary objection to our jurisdiction.

### B. Original Jurisdiction

It is true that the Department's decisions regarding inmate misconduct convictions generally fall outside the scope of our original jurisdiction, even where a prisoner's constitutional rights have allegedly been violated. "Prison inmates do not enjoy the same level of constitutional protections afforded to non-incarcerated citizens." *Bronson v. Cent. Off. Rev. Comm.*, 721 A.2d 357, 359 (Pa. 1998). As we have noted in the past, "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Robson v. Biester*, 420 A.2d 9, 13 (Pa. Cmwlth. 1980).

However, "[t]here is a narrow exception if an inmate can identify a personal or property interest not limited by [Department] regulations and affected by a final [Department] decision. . . . If one of these interests is involved, the inmate is entitled to notice and an opportunity to be heard." *Hill*, 64 A.3d at 1167 (citation omitted); *see Hill v. Com.* (Pa. Cmwlth., No. 684 M.D. 2018, filed Sept. 12, 2019), slip op. at 4, 2019 WL 4315763, at *2 ("this Court's original jurisdiction may be invoked where a petitioner can identify a violation of constitutional rights" by the Department);[8] *Lawson v. Dep't of Corr.*, 539 A.2d 69, 71 (Pa. Cmwlth. 1988)

---

[8] Unreported Commonwealth Court opinions issued after January 15, 2008, may be cited for their persuasive value. *See* Internal Operating Procedures of the Commonwealth Court § 414(a), 210 Pa. Code § 69.414(a).

("where an inmate files an action in our original jurisdiction seeking review of Department action, our inquiry must be limited to a determination of whether a constitutional or statutory violation has occurred"). In the absence of such a violation, the Department's disciplinary decision is not an adjudication subject to this Court's review and therefore falls outside the scope of our original jurisdiction.[9] *Bronson*, 721 A.2d at 359.

Reading Feliciano's Petition for Review in context, it is apparent that he claims the Department violated his constitutional right to procedural due process. *See* Pet. for Review, ¶¶4-19, Ex. G. Specifically, according to Feliciano, the Department failed to provide him with the misconduct reports and urinalysis test results prior to the August 26, 2019 disciplinary hearing, which prevented him from being able to adequately defend himself at that hearing against the Department's claim that he had used an illicit substance. *Id.* In the context of prison disciplinary proceedings, three components, at minimum, must be present to satisfy an inmate's right to procedural due process:

> [A]dvance written notice of the claimed violation[;] a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken[;] . . . [and the ability] to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.

*Wolff v. McDonnell*, 418 U.S. 539, 563, 566 (1974). The facts averred by Feliciano suggest that the Department arguably did not comply with either the first or third requirement.

---

[9] To the extent that Feliciano's due process claim could be interpreted as springing from the Department's violation of its own internal administrative regulations, we would not have original jurisdiction to consider such a claim, as the Department's regulations do not, in themselves, confer upon inmates any actionable rights. *See Williams v. Wetzel*, 232 A.3d 652 (Pa. 2020).

8

The question remains, however, whether Feliciano was even entitled to procedural due process under the circumstances.

> Procedural due process rights are triggered by deprivation of a legally cognizable liberty interest. For a prisoner, such a deprivation occurs when the prison "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 . . . (1995). Lesser restraints on a prisoner's freedom are deemed to fall "within the expected perimeters of the sentence imposed by a court of law." *Id.* If a prisoner ha[s] no protected liberty interest in remaining free of disciplinary custody, then the state owes him no process before placing him in disciplinary confinement.

*Brown v. Blaine*, 833 A.2d 1166, 1172 (Pa. Cmwlth. 2003). "In *Sandin's* wake[, courts] have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005); *accord Aref v. Lynch*, 833 F.3d 242, 253 (D.C. Cir. 2016) (noting that "[t]he *Sandin* Court did not define the baseline from which to measure what is 'atypical and significant' in a particular prison system, so lower court assessments have diverged[,]" and discussing how the above-referenced portion of *Sandin* has been interpreted in different ways by multiple Federal Courts of Appeals). In spite of *Sandin's* ill-defined standard, we have nevertheless consistently referenced it in determining whether inmates are entitled to procedural due process in the context of internal prison matters. *See, e.g.*, *Dantzler*, 218 A.3d at 523-24; *Lopez v. Pa. Dep't of Corr.*, 119 A.3d 1081, 1085 (Pa. Cmwlth. 2015), *aff'd sub nom. Lopez v. Wetzel*, 144 A.3d 92 (Pa. 2016); *Clark v. Beard*, 918 A.2d 155, 162 (Pa. Cmwlth. 2007); *Luckett v. Blaine*, 850 A.2d 811, 820 (Pa. Cmwlth. 2004); *Weaver v. Pa. Dep't of Corr.*, 829 A.2d 750, 752 (Pa. Cmwlth. 2003).

What has remained *inconsistent*, however, is our interpretation of *Sandin*'s requirements, which has oscillated markedly between cases over the course of two-plus decades. A brief review of our case law dealing with procedural due process in prison settings is instructive.

In *Chem v. Horn*, we sustained a demurrer to Chem's petition for review, through which he sought a declaratory judgment that the Department's drug testing policy was unconstitutional. 725 A.2d 226 (Pa. Cmwlth. 1999). Chem stated that he had been falsely accused of drug use on account of an erroneous urine test and had been punished by being placed in restrictive housing and having the test results become part of his institutional file. *Id.* at 227-28. Chem claimed that the Department's policy-based refusal to allow him to retest his urine specimen, in order to defend against the Department's accusation, violated his procedural due process and equal protection rights. We found Chem's procedural due process argument to be lacking, in large part because we read *Sandin* as "[holding] that remaining in a prison's general population [as opposed to restricted housing] is not a protected liberty interest[,]" 725 A.2d at 229. In doing so, we effectively concluded that this was a bright-line rule, as we offered no specific analysis of Chem's situation relative to other inmates. *Id.*

Four years later, in *Brown*, we affirmed in part the Court of Common Pleas of Greene County's decision to dismiss Brown's complaint on the basis of demurrer. Relevant to this matter, we agreed with the Court of Common Pleas of Greene County that Brown had failed to state a proper procedural due process claim challenging misconducts he had received and the consequent punishments. 833 A.2d at 1172. In doing so, we seemly discarded the rigidity of *Chem* and held that Brown was not entitled to procedural due process because he had not "allege[d] any

10

condition of confinement that was appreciably different from the conditions of other similarly situated inmates or that [the] 120 days in restrictive custody [Brown received] could constitute an atypical scenario[.]" *Id.*[10]

The following year, we drifted back towards the *Chem* standard in *Luckett*, through which we affirmed the Court of Common Pleas of Greene County's dismissal of Luckett's complaint on the basis of preliminary objections filed thereto. 850 A.2d 811. Of relevance to this matter, Luckett claimed that his placement in disciplinary custody had violated his procedural due process rights. *Id.* at 815. We concluded that Luckett had not stated a procedural due process claim because "temporary residence in [the restricted housing unit] at SCI-Greene is simply not atypical or significant when compared to the usual incidents of prison life at that institution." *Id.* at 820. The *Luckett* Court did not provide any additional factual information to explain how or why it came to this conclusion.

Three years later, in *Clark*, we affirmed the Court of Common Pleas of Greene County's dismissal at the preliminary objections stage of a complaint filed by a number of death row inmates, through which the inmates challenged the conditions of their confinement on procedural due process grounds. 918 A.2d 155. On appeal, we determined that the Court of Common Pleas of Greene County had correctly ruled that the inmates had not articulated a legally viable procedural due process claim; though

---

[10] The *Brown* Court supported this conclusion by citing *Griffin v. Vaughn*, 112 F.3d 703 (3d Cir. 1997), which was flatly described in an accompanying parenthetical as holding that "15 months in administrative custody [is] not atypical[.]" *Brown*, 833 A.2d at 1172. However, in doing so, we inexplicably failed to mention that *Griffin* was adjudicated at the summary judgment stage or that the *Griffin* Court employed a detailed factual and situation-specific analysis in support of its holding that, per *Sandin*, Griffin was not entitled to procedural due process. *Id.*; *see Griffin*, 112 F.3d at 706-09.

> [t]heir complaint describe[d] the conditions in the Capital Case Unit . . . it [was] devoid of any baseline against which to measure those conditions and determine whether they pose[d] an "atypical and significant hardship." . . . Nor [did the inmates] aver that the conditions of confinement in the Capital Case Unit [were] any more restrictive than other types of segregated housing at SCI-Greene or SCI-Graterford.

*Id.* at 162-63. This conclusion echoed the fact-specific inquiry of *Brown*, rather than the hard standard of *Chem*.

Another eight years passed before we faced a similar situation in *Lopez*. Lopez filed a mandamus petition, through which he argued that the conditions of his housing on death row violated his constitutional rights. 119 A.3d 1081. We dismissed Lopez's procedural due process claims at the preliminary objections stage, because he "[did not] establish that he has a protected liberty interest in avoiding being housed in the capital case unit." *Id.* at 1089. We based this ruling upon Lopez's failure to

> provide a comparison with the general population[,] outside of the fact that the general population is not restricted to solitary confinement and a brief mention in the relief sought section of the [p]etition that capital case prisoners be given two extra hours of "inside the unit recreation, as all those in the general population but in our own capital case units."

*Id.* Accordingly, the *Lopez* Court held that he had not averred facts which "establish[ed] that the conditions in the capital case unit [were] so onerous as to be an atypical and significant hardship on him in relation to the ordinary incidents of prison life." *Id.* As in *Brown* and *Clark*, we effectively determined in *Lopez* that *Sandin* did not create a bright-line rule regarding procedural due process rights.

Even so, we once again departed from such flexibility when, in 2019, we issued two decisions which hewed closely to our rulings in *Chem* and *Luckett*. First,

in *Dantzler*, we concluded we did not have original jurisdiction over Dantzler's petition for review, which challenged on procedural due process grounds a misconduct he had received for wearing a Department-issued belt that, unbeknownst to Dantzler, had subsequently been classified as impermissible contraband. 218 A.3d 519. We flatly stated that the punishments imposed upon Dantzler as a result of the misconduct, 30 days of cell restriction and confiscation of the belt, were not "atypical and significant hardships in relation to the ordinary incidents of prison life." *Id.* at 523. Therefore, we held that these punishments did not implicate a protected liberty interest and, thus, Dantzler was not entitled to procedural due process. *Id.* The *Dantzler* Court did not do any factual analysis to support this determination regarding atypical and significant hardship, other than to say that 30 days had not been found to be an atypical and significant hardship by the *Sandin* Court, the *Brown* court, or the Commonwealth Court in *Horan v. Newingham* (Pa. Cmwlth., No. 2622 C.D. 2015, filed October 24, 2016), 2016 WL 6156221. *See Dantzler*, 218 A.3d at 524. Second, in *Sanders v. Wetzel*, we sustained demurrers to Sanders' mandamus petition, in which he argued that the misconduct he had received for drug possession, as well as the resultant penalty of 90 days' disciplinary custody and loss of his prison job, had been imposed without the required procedural due process. 223 A.3d 735, 742 (Pa. Cmwlth. 2019). In relevant part, we interpreted *Sandin* as standing for the proposition that "an inmate's placement in segregated confinement does not create an actionable liberty interest that would trigger due process protection." 223 A.3d at 742. Additionally, the *Sanders* Court expressly stated that "the law does not require an inmate to be afforded due process in connection with placement in segregated housing." *Id.*

13

As shown by these cases, we have inadvertently created two parallel lines of cases interpreting the dictates of *Sandin*, ones that stand in tension with each other. This lack of consistency compels us to return to *Sandin* itself, so that we may establish a firm and precise understanding of its holding. After generally articulating the legal requirement of "atypical and significant hardship," the *Sandin* Court reviewed the case record and stated:

> We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody.[] We note also that [Hawaii] expunged Conner's disciplinary record with respect to the "high misconduct" charge nine months after Conner served time in segregation. Thus, Conner's confinement did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction. Indeed, the conditions at Halawa [Correctional Facility] involve significant amounts of "lockdown time" even for inmates in the general population.[] Based on a comparison between inmates inside and outside disciplinary segregation, [Hawaii's] actions in placing him there for 30 days did not work a major disruption in his environment.[]

> Nor does Conner's situation present a case where [Hawaii's] action will inevitably affect the duration of his sentence. Nothing in Hawaii's code requires the parole board to deny parole in the face of a misconduct record or to grant parole in its absence, Haw. Rev. Stat. §§ 353–68, 353–69 (1985), even though misconduct is by regulation a relevant consideration, Haw. Admin. Rule § 23–700–33(b) (effective Aug. 1992). The decision to release a prisoner rests on a myriad of considerations. And, the prisoner is afforded procedural protection at his parole hearing in order to explain the circumstances behind his misconduct record. Haw. Admin. Rule §§ 23–700–31(a), 23–700–35(c), 23–700–36 (1983). The chance that a

14

finding of misconduct will alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process Clause. The Court rejected a similar claim in *Meachum* [*v. Fano*, 427 U.S. 215, 229 n.8 (1976)] (declining to afford relief on the basis that petitioner's transfer record might affect his future confinement and possibility of parole).[]

We hold, therefore, that neither the Hawaii prison regulation in question, [which required the accused to be found guilty by the prison disciplinary committee when a misconduct allegation was supported by substantial evidence,] nor the Due Process Clause itself, afforded Conner a protected liberty interest that would entitle him to the procedural protections set forth in *Wolff*. The regime to which he was subjected as a result of the misconduct hearing was within the range of confinement to be normally expected for [an inmate like Conner, who is] serving an indeterminate term of 30 years to life.

*Sandin*, 515 U.S. at 486-87 (internal footnotes omitted). Thus, rather than creating a *per se* bar against an inmate's right to procedural due process in each situation where internal prison discipline has been imposed, *Sandin* instead requires a fact-specific inquiry. *See Wilkinson*, 545 U.S. at 223 (determining, through a fact-specific inquiry per *Sandin*, that inmates were entitled to procedural due process before being transferred to Supermax prison).

In keeping with this conclusion, we adopt the test created by the United States Court of Appeals for the District of Columbia Circuit in *Aref*. Though we are not bound by federal circuit or district courts' interpretations of federal constitutional law, such interpretations nonetheless operate as persuasive authority, which we may use at our discretion. *See Com. v. Hicks*, 208 A.3d 916, 936 n.13 (Pa. 2019); *Stone Crushed P'ship v. Kassab Archbold Jackson & O'Brien*, 908 A.2d 875, 884 n.10 (Pa. 2006); *W. Chester Area Sch. Dist. v. A.M.*, 164 A.3d 620, 630 (Pa. Cmwlth. 2017). To that end, we believe *Aref* both accurately distills *Sandin*'s holding and

articulates the proper method for determining whether an inmate is entitled to procedural due process in the context of an administrative determination that affects his carceral housing situation:

> [T]he proper methodology for evaluating [procedural due process] deprivation claims under *Sandin* is to consider (i) the conditions of confinement relative to administrative segregation, (ii) the duration of that confinement generally, and (iii) the duration relative to length of administrative segregation routinely imposed on prisoners serving similar sentences. We also emphasize that a liberty interest can potentially arise under less-severe conditions when the deprivation is prolonged or indefinite.

*Aref*, 833 F.3d at 255.

Turning to the Petition for Review itself, Feliciano fails to state therein that the punishment imposed upon him as a result of his failed drug test, *i.e.*, 30 days of disciplinary custody, constituted an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Nor does he offer any averments that would allow us to come to such a conclusion at this stage in the proceedings. There is thus nothing in the Petition for Review, as currently constituted, that would allow us to conclude that the Department was required to afford Feliciano with procedural due process in relation to that sanction. Consequently, we do not have original jurisdiction to consider the Petition for Review and will sustain the Department's preliminary objections on that basis as well. We will however, permit Feliciano to amend his Petition for Review within 30 days of receiving this opinion, in light of our articulation *supra* of clear guidance regarding the necessary components of a legally viable procedural due process claim in the context of internal prison matters.[11]

---

[11] Given our disposition of this matter on jurisdictional grounds, it is unnecessary for us to address the Department's remaining demurrer-based preliminary objection.

16

## IV. Conclusion

On the basis of the foregoing analysis, we sustain the Department's preliminary objection to our jurisdiction and dismiss the Petition for Review without prejudice. We grant Feliciano leave to file an Amended Petition for Review within 30 days of the date he receives this opinion.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Anthony Feliciano,                          :
                    Petitioner             :
        v.                                  :   No. 588 M.D. 2019
                                            :
Pennsylvania Department                     :
of Corrections,                             :
                    Respondent             :

# **O R D E R**

AND NOW, this 13th day of April, 2021, it is hereby ORDERED that Respondent Pennsylvania Department of Corrections' (Department) preliminary objection to our jurisdiction over Petitioner Anthony Feliciano's (Feliciano) Petition for Review is SUSTAINED. Feliciano's Petition for Review is DISMISSED WITHOUT PREJUDICE. Feliciano shall have thirty (30) days from the date upon which he receives this order and the attached opinion to file an Amended Petition for Review.

_____
ELLEN CEISLER, Judge